Mr. Taylor. May it please the Court, Mark Taylor on behalf of the appellant, Kevin O'Halloran, who is the liquidating trustee for the Liquidating Trust of Teletronics, Inc. Mr. O'Halloran is in the courtroom as well, along with my partner, Morris Weiss. Your Honors, there are two issues that are presented in this appeal. The first is whether the bankruptcy court erred in holding that the appellant failed to prove the value of the asset that it claims was the subject of the fraudulent transfer. The second is whether or not the bankruptcy court erred in holding that the appellant failed to prove that the debtor was insolvent at the time of the transfer. And as a subpart of that, whether the court erred in admitting the testimony of the appellee's expert, Stephen Osher, regarding the value of certain maintenance contracts that were added back to the balance sheet for the solvency analysis. We're asking that this court reverse and render the decisions below. There was evidence presented as to the amount of damages at trial on which this court could require the entry of a judgment that set forth in our brief and was presented to the trial court. With respect to the first issue, Your Honors, and that is whether or not the court erred in failing to prove the value of the asset that was transferred, as the court may recall from looking at the briefs, what happened was in January of 2009, Teltronics entered an agreement with Harris Corporation to transfer a certain right that Teltronics held at that time. And that right was a right to prevent or block the sale of certain patents that were held by Harris Corporations that had formerly been owned by Teltronics and had been conveyed to Harris Corporation in connection with a transaction between the parties in 2004. These were valuable patent rights. And at the time, Teltronics had a license to use them and had the right to block a sale of those patents to anyone up through July 31, 2010. And then after July 31, 2010, it actually had a right of first refusal to purchase those patents if Harris determined that it was going to sell the patents. So what happened in 2009 was that Harris decided it was going to sell these patents or would like to sell the patents that it held to a company called RPX. RPX is a patent defense aggregator, sort of the opposite of a patent troll, and would acquire patents for defensive purposes under a subscription model with its clients. Mr. Tedder, can I interrupt and ask you a couple of questions? Yes. My impression is that Harris sold a business to the debtor. It did originally. The original contract or whatever you want to call it. Yes, Your Honor. It described all kinds of things. And patents were in it. But can we assume that the debtor kept that business except for the patent situation that we're talking about? Yes, Your Honor. It was in 2000 that Teltronics purchased a division from Harris and that division included the rights to those patents. Yeah. The whole division of Harris. That's correct. And the patents were reconveyed as part of a restructuring of the debt arising from that initial transaction in 2004. Yeah. That's correct, Your Honor. And so after that point, what Teltronics held with respect to the patents was a blocking right to prevent a sale through July 31st and then a right of first refusal after that date. Teltronics, excuse me, Harris decided it wanted to sell those patents. It wanted to monetize them. So it put them out for sale. And in late 2008, in their discussions with RPX about a sale, that moved pretty quickly, and ultimately they agreed upon a price of $12 million for the sale of that patent portfolio. However, Harris could not sell that patent portfolio because of the blocking right that Teltronics owned, and it would own through July of 2010. So what Harris did at that point is it negotiated a window during which the blocking right was released and allowed them to sell the patents free and clear of the blocking right through April of 2009. At the time they did that, the sale was already arranged with RPX. It was a done deal, and it was going to be a sale for the $12 million. And what happened, what Judge Williamson said below and what the district court agreed with was that what was lost by Teltronics at that time was the blocking right, not a right of first refusal, because that had not matured yet. The problem is the two are tied together. Harris could not sell. What Harris wanted to do was sell patents, and it couldn't do it unless it got rid of the blocking right. And because it already had a sale lined up and ready to go, what it effectively did was eliminate any chance of a right of first refusal knowing it had a sale lined up by eliminating the blocking right for a period of time to let it sell those assets free and clear of anything. And in return, what Teltronics got was $5,000 for a patent portfolio. Can we say that at the end of the day, that Enter had the business that it bought in the first place and it had rights to license the patents? For its own use. As a licensee, yeah. For its own use, that's correct. That's what was left, the business and the licenses. That's correct. But what was fraudulently transferred were the rights that Teltronics held to block a sale which apparently to Harris was worth at least $12 million, the sale was. The testimony at trial was that the patent portfolio was worth $14 million. The patents were worth $12 million. That's correct. That's correct. But they could not realize that value unless that blocking right was released. That was the only way they could do it. And the person that held that blocking right was Teltronics, and Teltronics received $5,000 for the release of those blocking rights that resulted in $12 million being realized by Harris. And if you look at the objective value of the patents that were sold, which is what the case law says you must do, you don't look at the subjective motivations of the parties or the subjective valuations of the parties, the only evidences to the value of those patents was that of Mr. Goldman at the trial, which was $14 million. So what Teltronics lost was $14 million less what it would have cost to obtain those patents. That's the option, what I'll call the option price, what had to be paid to acquire those, which was about $1.6 million. I think the exact amount that was calculated and presented at trial was $1,652,000 and, of course, the $5,000. So that's what they lost out on by allowing the elimination of the rights that Teltronics had to block the sale or purchase, ultimately, the assets. But I look at the economics and the dynamics of this. When Harris went to Teltronics to try to negotiate their way out of the blocking position, Teltronics asked whether there was a deal out there. And based on what I read, they got what was possibly a very cute and possibly not entirely candid answer. But even putting that to one side, the only reason Harris would come to them was that they were contemplating at least a sale of the patents, right? They were trying to complete the sale of the patents? I'm sorry. They were contemplating, at a minimum contemplating, a sale of the patent portfolio. Yes. And so knowing that that was the game, Teltronics gives up the blocking position for $5,000. It did. It did. Now, I'm really puzzled by that and about what its implications are for this case because Teltronics certainly knew what the patents were, certainly knew, in some sense, that they were worth more than $5,000. It makes no difference for a fraudulent transfer action whether they'd have thought about the assets, what they thought the value was and what they thought the acquirer was receiving. That is not an element of a constructive fraudulent transfer action. Or does it? If, in fact, the practical effect of giving up the blocking position was to give up also the right of first refusal, and I understand your argument about that, doesn't it say that maybe Teltronics didn't think there was any value there? That's why they parted with it for $5,000. Or that they never would have had the money to exercise the right of first refusal even if it came to them? Well, two responses, Your Honor, and they both go to what the law says. The law says, number one, you don't look to the subjective thoughts of either party and, two, that you don't look to whether or not the debtor could have afforded it at the time because that's the very idea behind a fraudulent transfer, that you are taking advantage of a debtor who is in a weakened financial position. All right, but the question I asked you, I mean, I've read the cases too, the question I asked you was really about what's really going on in this dynamic. I'd like to understand that. Well, what was really going on in the dynamic was you had what I think the evidence shows, and there's not a lot of evidence about what the party's state of mind was at the time, was that there was a longstanding relationship and business relationship between these parties. Harris went to Teltronics and said, we need a favor. We look to monetize these things from time to time. We'd like the flexibility to monetize them. For whatever reason, Teltronics, I believe, maybe they were only concerned with having a license and not having the ultimate right to own the patents, so they let it go for a song. That's all we really know what happened in this case. And that fact story, again, what Harris thought they were worth, what Teltronics thought they were worth, is not relevant to, you know, what really happened with respect to the debtor and whether Teltronics thought they were giving up something valuable or whether they thought it wasn't worth anything is not the basis or a consideration at all in a constructive fraud and transfer action. Isn't what Teltronics thought they were worth at least an item of evidence on the question of whether there was fair consideration paid? I don't believe it is because it's the objective value. The case law is very specific on this and it's cited in our brief that the subjective views of the parties is not the measure in a fraudulent transfer case. So what a willing buyer will pay to a willing seller is irrelevant. What it is is a contest of experts. Well, in a willing buyer, willing seller is the fair market value analysis. And what we are saying is the debtor did not receive fair market value for these assets, which goes to whether or not there was reasonable equivalent value in the fraudulent transfer case. So willing buyer, willing seller, when you have a distressed seller who apparently doesn't really know what's going on and doesn't know what the value is, that's what a constructive fraudulent transfer action is designed to protect against. And that's expressly what the case law says. And because if I had a house and I was, as I heard in one of the other cases, an unsophisticated consumer, the jury's Uncle Jake. No one would ever suggest that. Cousin Jake. And I didn't know what my house was worth and someone came to me and said, you know, I'm going to give you $100,000 for your house, that person knowing that there were valuable mental rights, I'm in Texas, that were in the backyard where they could frack and make millions of dollars, I transfer that at a time that renders me insolvent or I am insolvent, then that is a classic constructive fraudulent transfer case. And so what the seller knows or thinks about the value of what is being transferred is not relevant. It's what is the objective value, because the whole idea is you're trying to and the way you do that is you get back into the estate the value of what was transferred out of the estate for less than a reasonably equivalent value. And that is the very essence of a constructive fraudulent transfer claim. And that's why the thoughts and motivations of the parties are not relevant in that regard. This isn't an actual fraudulent transfer case where we're looking about whether or not there was intent to deceive or intent to hide assets. It's whether or not they were transferred at a time when the debtor was insolvent for less than a reasonably equivalent value. Pardon me. With respect to the second issue, and that's whether or not the debtor, the appellant proved that the debtor was insolvent at the time of the transfers, the testimony that the appellant put on, that we put on at trial from Barry Mukumal, showed clearly that on a balance sheet basis, on a fair valuation basis, which is the way you have to do it under the bankruptcy code, that the debtor was insolvent at the time of the transfer. The appellee offered the opinion testimony of their expert, Stephen Osher, who is qualified. And we don't argue he wasn't qualified. But here's the problem with what he did. So there were certain maintenance contracts that weren't reflected on the balance sheet because it's not a GAAP accounting item. So you have to go and value those maintenance contracts if you want to say they have value, and then add those into the assets side of the balance sheet to see whether or not the debtor was solvent at the time of the transfer. The problem with what Mr. Osher did is that he didn't do any analysis. He admits that. And it's through the trial transcript of his testimony, starting on page 26 through page 38, and it's very clear that what he did is he looked at a couple of other evaluations that other people did, which an expert can do. What is our standard of view, though, when deciding the bankruptcy court valued, no pun intended, the testimony of Osher more than Mukumel on this point? What is our standard of review in evaluating that decision by the bankruptcy court? It's going to be an abuse of discretion standard. The methodology utilized I think you can look at as a matter of law. The admission of the testimony and the court's consideration of the testimony is an abuse of discretion standard. And what's your best argument, given that broad standard, why the bankruptcy court abused its discretion? Because this witness did nothing to make sure that the underlying opinions on which he based his opinion, which in his words was an opinion for demonstration purposes. That's exactly what he said. I've been doing this 30 years. I have no idea what an opinion for demonstration purposes is by an expert. It makes no sense. That's what they do for a living. Well, they can at least say it's my opinion, not it's for demonstrative purposes, for illustrative purposes. No, but let's come back to Mr. Osher for a minute. Yes. There were really two central components of his testimony. Central component one was his assessment that the maintenance contracts, whatever their value, belonged in the solvency analysis. They should have been reflected on the bank, on the asset side of the balance sheet. Component number two was opinion as to value of those contracts. Now, as I understand it, the bankruptcy judge accepted Osher's testimony that the contracts, whatever their value, belonged on the asset side of the balance sheet for the solvency analysis and then proceeded, as I read it, not to accept his testimony as to value, which is the point to which your argument about his not having made an independent analysis of value goes, and then say your client lost because your client was obliged to prove insolvency and given the acceptance of Osher's testimony that these were assets and the lack of any proof on your side as to what their value was, you lost. So that the argument that he had an inadequate basis in fact and analysis, Osher, to value the contracts ultimately doesn't matter here, as I understand it. What matters here is whether the trial judge abused his discretion or made a clearly erroneous finding in determining that Osher's testimony that they belonged on the balance sheet was no good or erred in saying that your side had the burden of proof on insolvency and there was a failure of proof because you didn't prove what the value of the contracts was and taking that failure into account never proved insolvency. Now, am I not right about the analysis here? I think you are correct on the analysis, Your Honor, and what Mr. Mukamal, our expert, said was, yes, you can have an intangible asset that you value and place on the balance sheet for insolvency purposes, but in this context, in looking at the maintenance contracts, you can't value those without taking into account the burdens that are associated with those to service the maintenance contracts, to have the goods on file, to provide to the people under the maintenance contracts, to have the administrative staff to service those administrative burdens related to the maintenance contracts. And what he testified to, and this is in his testimony both on page 58 and page 74 and on, from his trial testimony, is that that is a flawed analysis because it fails to take into account the burdens associated with those contracts and if you did do that on an enterprise valuation basis, this debtor had a negative enterprise valuation at the time and had $33 million of accumulated deficit, in other words, accumulated losses from these maintenance contracts that were supposedly so valuable. But what do you do with the fact that the trial judge didn't credit that? I don't know why Judge Williamson didn't credit that. I don't know. The evidence is in the record and so... But that's the ballgame, isn't it? It's not. It was his job to decide whether he credited Mukamal's testimony in that regard and he said no. Well, here's the way I think it works and maybe I'm wrong, but this is the way I think it works and that is we put on a prima facie case showing that the debtor's insolvent. The other side says, wait a minute, you have to take this into account and we think this amount should be added in. There has to be a credible basis for that argument to overcome the prima facie case of insolvency and there was no credible case for that argument because of the fundamental flaws in Mr. Osher's analysis where he did no analysis. He did nothing. But that all went to what the number was. In the last analysis, both experts said either that the contracts, whatever their value, belong on the asset side or can be reflected on the asset side and then the question is what's the number and Mukamal then disputed Osher's number. The judge did not accept Osher's number and the judge didn't accept Mukamal's testimony that it got you into negative territory if you took into account all the burdens associated with the contract and why isn't that simply failure of proof? You lose, you didn't sustain your burden. Because we did put on a prima facie case showing insolvency and what the judge said was that Mr. Osher, that he did take into account Mr. Osher's analysis and he said that presented essentially a credible case that the debtor was solvent at the time of the transfers when there was no basis for that to be done. So what you're left with is a prima facie case showing insolvency, testimony from Mr. Osher that should not have been admitted, it doesn't matter if this is a trial, a bench trial or a jury trial, it was fundamentally flawed analysis. It matters a lot. I mean, suppose you have a, well, it's always dangerous to make up a hypothetical on the fly, but if the plaintiff in a simple personal injury case puts in a prima facie case and a bench trial and at the end of the plaintiff's case somebody moves for judgment on partial Rule 52 judgment and the judge said, well, I just don't believe the plaintiff's evidence on a central element of the plaintiff's prima facie case, the plaintiff loses. Right? Yes. Okay, now why isn't that this case? Because the prima facie case in this was what Mr. Mukamal put on when he did an analysis of what the balance sheet solvency was and that was in his direct testimony. And then if someone, they have, what is it, a burden of persuasion at that point to rebut what is put on by Mr. Mukamal? No, suppose they rest and say, Mr. Mukamal's analysis is not credible. It's not reliable, Judge, and we want you to dismiss. Now, they could have done that and if the judge was of that view, you would have lost. Right? The difference here is what they wanted to do was add something to the balance sheet to change the solvency analysis. And when they want to add something to the balance sheet to change the solvency analysis, the burden is on them to come forth with credible, admissible evidence to show what that number is and they failed to do it. And I think that's what the difference is. Well, I don't accept that, I think. Maybe you can persuade me I'm mistaken. But they came in with credible evidence that the right accounting analysis, the right solvency analysis was that the value of those contracts, whatever it was, belonged on the balance sheet, on the asset side. That's correct. The judge agreed with that. And now the question is, given that finding, has the plaintiff come forward with credible evidence that even reflecting those contracts, there is still insolvency? And the judge said no, and I'm having a hard time seeing what was wrong with that. Well, what was wrong with it was that... Why don't you mull over the answer to that question in your rebuttal, because you've used up some of it. Certainly, Your Honor. I'll do that. Thank you. You have six minutes left. Sorry to take so much time. Mr. McDowell. Good morning, Your Honors. My name is Brian McDowell. I represent Harris Corporation and RPX Corporation. May it please the Court. Your Honors, to prove up a constructive fraudulent conveyance case, a plaintiff must show that there was a transfer made by the debtor for less than reasonably equivalent value at a time when the debtor was insolvent. The plaintiff's case trial, as to reasonably equivalent value, was to present evidence of a patent portfolio which it did not own. In the support, the plaintiff, now the appellant, cited to several cases that identified the measure of damages in a fraudulent transfer case where the subject of the transfer was an option or property subject to it as being the value of the property less the strike price on the option. The problem here is that the debtor didn't have an option. What the debtor had was a blocking right. Parties have called it a blocking right throughout this case. It was essentially the right to stop a sale of the patents by Harris. The testimony of the trial concerning the blocking right was that Teltronic's real concern was that the technology not be passed on to a competitor. That was their concern. That's why the blocking right came into place. The cases cited by the appellant define an option as giving the holder of the option the right to unilaterally compel a sale at any time. That's not what the debtor had in this case. Mr. McDonald, let me tell you where I am. Okay. The debtor had this business that he had bought from Harris. Correct. The patents were part of the value of the business. At that time, correct. Yeah, that's what... In the bundle of sticks that came from Harris, there were some patents. That's correct. Along with a whole lot of other things. That's right. Okay. These are sophisticated parties, so I assume they came to some agreement in their own minds anyway as to the value of the whole business. Exactly. And in that, they must have had some estimate of the value of the patents. Presumably. That's part of the asset. Presumably. Yeah. So, the big issue here is about this giving up the blocking or losing the blocking right. So, the way I look at it is what did that do? To the business. I understand the question. To decide what giving up that had, whether or not that was for lack of adequate compensation, you've got to take into account the whole business, I would think. Well, yes, I think.  can use the protection of the patent. That's right. Teltronics retained the use of the technology, although ownership of the patents passed back to Harris. They gave back in the settlement to Harris a part of the bundle of sticks. Okay, I accept that. Okay. I mean, that's my approach to this problem. Right. And so, to figure out, you have to have some estimate of value. The whole business and what was given up, I would think. Well, the... Which is what the bankruptcy judge was wrestling with. Well, the bankruptcy judge was wrestling with what was the transfer made by the debtor. Yeah, I understand. And so, yes... It was the last transfer. Say again? I'm sorry? It was the last transfer, as I understand it. Right. The transaction that's challenged by the plaintiff, the appellant in this case, was the release of the blocking right. That's the last thing that happened to this business. Right, exactly. They released the blocking. And that's the transaction that's challenged here. I understand that. And so, the question was... One of the ways I look at it is what effect did that have on the value of the business? We believe it had none. It didn't have any, as I can see it. It didn't have any effect on it. And we can demonstrate that a couple of different ways. First of all, if the court considers what the remedy for a plaintiff in a fraudulent transfer case is, under 11 U.S.C. 550, a court should avoid the transfer, return the parties to their original condition, and then attempt to value the result. So, it's helpful to go through that exercise. So, let's avoid the transfer. If you avoid it, put it back where it started. Harris would own the patents. Teltronics would have its blocking right. What's that worth? We don't know because there was never any proof offered on account of that. Now, the second way we can look at that... Well, we do know one thing. There were sophisticated parties and they bargained over it. Indeed so, Your Honor. Both companies were publicly traded at the time of the alleged fraudulent transfer. Both parties were highly sophisticated and completely understood the transactions they were making. Teltronics had an estimate of what that would do to its business, I suppose. Right. In fact, there's testimony at trial. The president, the now former president and CEO of Teltronics, testified that, from his perspective, the blocking right didn't have any value other than to ensure that no competitors would be formed as a result of a transfer. And they preserved that right in the transaction. They did. Indeed so. That right was never waived. There was some discussion... But you would argue that it certainly didn't affect Teltronics' business as long as the competitor didn't get these rights. They had $5,000, $10,000, whatever. That's correct. Can you make an argument the other way, though, that they could have struck a tougher bargain, that Harris would have paid a lot more than $5,000 to be out from under the blocking right? The argument could be made, but there's no evidence to support it on this record. The only evidence with respect to what the blocking right was worth was what Harris paid for, $5,000. That's supported by testimony from Teltronics' CEO that suggests that they had already... Well, the $5,000 is what the parties thought. Excuse me? The $5,000 was a compromise. That's right. That was what the parties arrived at in order to clear that impediment. But the reason I mention that is we're not dealing with a situation in which they're not dealing at arm's length and they're not sophisticated. They were certainly sophisticated. So $5,000 was in the ballpark. Absolutely. So you disagree with your adversary, then, who argues that this was a transaction between a willing buyer and a willing seller, neither under any compulsion, to engage in the transaction. And he says, nevertheless, it's not any evidence, proper evidence, as to what the value was of the blocking right. I take it you disagree with that. Well, I do. I think that there's evidence that the blocking right... First, there's evidence that the blocking right was completely separate from a potential option. That's not what they held. But there's plenty of evidence as to why Teltronics thought that was the right value. Why they thought they'd already gotten the economic benefit from the series of transactions that preceded it. And ultimately, that's how they arrived at the deal. As long as there was no competitor, it no longer had any value to them. I mean, there was testimony that even if a right of first refusal had been in effect, they wouldn't have been in a position to monetize it. They lacked the wherewithal. They lacked the resources. They lacked the knowledge. Teltronics was exposed to counterclaim risk, which Harris was not. Your adversary says it doesn't matter that they could have never purchased the option. They didn't have the wherewithal. My colleague's argument goes to the question of... It still doesn't resolve the question of what is it that you're valuing when you value something? What is it that you're valuing? I mean, in essence, our argument is they valued the wrong asset at trial. Ultimately, I believe that persuaded Judge Williamson that they had indeed valued the wrong asset. The fundamental flaw in the plaintiff's case is that they assumed to be equal the rights of an option holder and the rights that you have when you have a blocking right. To further support that, the testimony at trial was that had the transaction between Harris and RPX been impeded by Teltronics' rights, that the parties to the sale, Harris and RPX, would have simply licensed it so as to accomplish RPX's goals. Remember, RPX was a defensive patent aggregator, a sort of anti-troll. They wanted to protect their customers by taking patents off the market. And they would have been able to do that with the form of license that was proposed. But both Harris and RPX testified that that form of transaction would have been accepted. And so, at the end of the day, what effect did the loss of the blocking right have? Well, there's no evidence in the record to suggest that the effect was anything other than nothing. And so to suggest that there's an equivalency between the rights that they had, Teltronics, and the rights that they needed, simply without basis in fact, without basis at all, makes a leap of equivalency that's not founded in this record. As to insolvency. Insolvency is defined in the code, in the bankruptcy code, and in the cases as the condition where the debtor's liabilities exceed its assets at fair valuation. In this case, both experts adopted essentially the same methodology. They started with the balance sheet. They made certain adjustments to it. Both of them increased inventory. Inventory is held on a balance sheet at cost, not value. We know that Teltronics made a significant margin on its inventory. And reduced the liabilities by certain obligations owed to equity, to insiders. The only question that they disagreed on was these maintenance contracts. And these maintenance contracts had represented a significant revenue source for Teltronics over a period of years. Steve Osher testified that they should be included in the analysis. Barry Muckamal, the plaintiff's expert at trial, disagreed with that. But according to Judge Williamson, Mr. Muckamal never credibly explained why not. And on that basis, Judge Williamson accepted the portion of Osher's testimony that went to inclusion. Now, I just heard counsel argue that somehow there's a burden of proof shift. What Harris's evidence did was point out an asset that the plaintiff had left off of its computation. Counsel, let me ask you a question. Yes, sir. As I see it, all the experts were doing was Monday morning quarterbacking. I'm sorry, Your Honor? The experts were engaged in Monday morning quarterbacking. You know what I mean by that? I understand the expression. They had a transaction before them that went through some adjustments. That's right. And they're looking at what these sophisticated arms-length dealers were doing. As experts do. And to the extent... So one side is, in effect, saying... Your opponents are saying, through the experts, their track is, is they made a bad mistake. They made a bad mistake in valuing what was given up and what was received. Implicit in their case, yes, I agree with that. That's what this case is about. Implicit, yes, I agree. If you squeeze it down, isn't that what it is? The contention, put simply... If they didn't have any experts, we wouldn't have anything. You'd have an assumption that all these things were done for fair value. Well, I think you would still have the position on our side. If General Motors and Fiat sat down and made a big deal, the assumption would be that it's fair to both sides. I agree with that. You agree with that? I do. Later on, you could produce experts who look back over it and say, well, it wasn't fair. Right. As experts do. In this case... So what I'm driving at is, what's the probative value of the Monday morning quarterback's testimony? Other than, if you accept one side, you say, Tektronix made a bad deal. Yeah, I mean, they were negligent to the stockholders. I think precisely the experts' testimony that we're referring to here was going to the question of insolvency. But, I mean, yeah, that's what happens is the experts look retrospectively at a point in time and they say, yeah, they either were or were not insolvent. And in this case, the result of the credit... And, of course, the experts couldn't possibly put themselves in the party's shoes because they'd have to know everything the parties knew about their business. I think that's true. I think that's true. And, again, I think it's important to emphasize that Mr. Osher never... Mr. Osher's number was never relied on in any material way by the court. It never got to a number. In fact, Judge Williamson never put a number on the maintenance contracts, only said that, yeah, the plaintiff left them out. And that's the essence of his testimony. A point about enterprise value. The testimony that Mr. Mukamal attempted to give with respect to insolvency as it relates to enterprise value was excluded by the court. There's a note in the district court order as to that. To the extent Mr. Mukamal was testifying about the inclusion of the asset as it related to enterprise value. That was the gist of it. Because you had to consider it in conjunction with the other attributes of the business that you should, by that analysis, leave the asset out. That was exactly the testimony that Judge Williamson found to be not credible. And, Your Honors, that's the essence of our primary issues on appeal. I'll speak only briefly about our cross-appeal. It was filed as a protective matter. It was an argument that, while we believe is correct, would apply in the circumstances if Your Honors found reason, which we would urge you not to, but if you found reason to reverse, that this argument would need to be considered. And, Your Honors, unless you have more questions, I'm not going to spend any more time on that. I think we understand your position. Thank you, Your Honor. Mr. Taylor, will you agree that was the role of the experts? Well, yes. They're basically Monday morning quarterbacks. So, yes. And your side of the case is they made a horrible mistake. Yes. And that's the fundamental nature of any fraudulent transfer suit, because you're looking in hindsight. They made a deal and they gave it away. They did. That's your position. That's correct, Your Honor. That is the essence of a fraudulent transfer suit. It is always Monday morning quarterbacking, because you're looking at a transfer that happened years ago. If you started off, if you had no experts, no allegations, two sophisticated parties made a business deal. That's right. And they adjusted it as time went on. That's right. And there'd be no fraudulent. You couldn't find a fraudulent transfer. That's right. Here's the reason. The reason you have the statute is exactly to prevent that from happening when it works to the detriment of the creditors of the corporation. So the bankruptcy judge was faced with a proposition of whether or not this was so bad that it was fraudulent. Yes, whether there was reasonably equivalent. That is to say it was given away. That's correct. They didn't have to do that. Whether there was reasonably equivalent value. Yes. That's the measure. And you always have to look at that in hindsight in these cases. And I'll disagree. In effect, the stockholders could have sued them for, in a derivative suit, I suppose, for mismanagement, some kind of thing. In theory. In theory, they would have had a claim for corporate negligence. Yes. I think the same idea, though. Right. It's a similar idea. This one is a cause of action that runs to the creditors, of course, for a loss of assets. And it's not based upon any — the difference is it's not based upon whether or not the debtor or its management was negligent or whether it breached its fiduciary duty. It's simply the objective view. And the case law is very clear on this. You don't look at the subjective views or thoughts of the parties. From an objective standpoint, did you get enough for what you gave up? Because the persons that are harmed by that are the creditors of the estate. And that's who this remedy is designed to protect and benefit, are the creditors of the estate. And it's not, as Mr. McDowell would tell you, that you just return what was given away. What the statute says is you return what's given away or the value thereof. And that's what we're looking for is to get a return of the value of what was given up. And to go back to Judge Kaplan's question at the end that we were discussing, I went back and looked at the opinion, and I thought this is what Judge Williamson had said. If you look on page 14 of Judge Williamson's opinion, what he says that Mr. Mukamal never credibly explained was Mr. Mukamal's statement that you can't just take this off the balance sheet and not consider what the attendant costs are and the effect on the business of taking that off the balance sheet. He never addresses, in his opinion at all, Mr. Mukamal's statement on pages 74 and 75 of his testimony from the February 12th transcript where he says that, okay, I'm going to use Mr. Oshiro's analysis, and that results in a negative enterprise value. And I'd ask the Court to look at that because that testimony came in without objection. I know there was one part of the testimony of Mr. Mukamal that the Court disallowed. That testimony came in without objection. And that testimony was that there was a negative enterprise value, even if you accept Oshiro's analysis. Sotomayor, he was not obliged to accept it, right? He doesn't address it at all. It's not addressed in his opinion. Implicit in the opinion is that he didn't buy it. Why under the doctrine of implied findings can't we say he did? Well, we don't know what he did, and perhaps we should ask if he could be remanded for findings. But when trial judges make findings, then we look to see what findings they have to make it by application to get there. What your argument is, there aren't any. Well, and here's why. I mean, the fact that he didn't talk about something doesn't mean that they ignored it. Well, here's why I think that's important in this case, because what Judge Williamson concludes in his opinion — Or is it your argument that the judge ignored evidence altogether? I don't know. I don't know what he did. It appears, if you look at page 16 of his opinion, what he says is there was — he doesn't say there was not credible evidence presented by the appellant. It said there was no evidence presented as to the value of those maintenance contracts. And there was evidence presented. I don't know why it wasn't considered. And there's no discussion of it in the opinion. I'm looking at the opinion from the bankruptcy reporter. So my pagination is different. But right near the end of the opinion, the judge says, because the court concludes the maintenance contract should be included in the value of the maintenance contracts when added to the other assets do not exceed the liabilities. And he then goes on to say that you failed to meet that burden. Implicitly, he said, I don't buy Mukamal's testimony. Well, I find — Is there any other way to read that? I think there is, particularly in the context of where he specifically says, I don't buy Mr. Mukamal's analysis. And that's on the analysis where he says he did not credibly explain why you can't take these assets off the balance sheet, value them, and then just stick them back in without considering the attendant cost. I think if the court is going to make that type — if the court is going to go down that road, then the proper course would be to remand it to Judge Williamson to make specific findings on that testimony. Because it is simply not addressed. It was briefed. It was presented to the court. It was argued to the court. It was not addressed. And what he says instead is, he doesn't say Mr. Mukamal presented no credible evidences to the value of those contracts. What he says is that Mr. Mukamal presented no evidences to the value of those contracts. I think that's a distinction. What he said was that the plaintiff failed to prove insolvency. That addresses it. It addresses it if he considered the evidence. I will agree with you with that. You know, sometimes — I make mistakes all the time. And sometimes judges make mistakes. And I think that Judge Williamson is as good of a judge as I found him to be during the course of this case. And he doesn't need me to tell him that. But I think he simply missed that testimony, and it's not addressed and not taken into consideration. But the problem is that we review judgments. We don't grade opinions. No, but you're entitled to look at the evidence that was presented. You look at — you look at what he wrote, and you're entitled to take into account the evidence that was presented at trial to see if the conclusions he reached were supported by the evidence. And the evidence in this case where Judge Williamson says that appellant didn't put on the evidence of the value of the maintenance contracts, that's simply wrong. That is not a correct statement of what was presented at the trial. And if you look at Mr. Mukamal's testimony where he said, if I adopt Mr. Osher's analysis, which I disagree with, but if I adopt his methodology of what he'd do and what he'd need to do in this case, then this company has a negative enterprise value, which means that it's insolvent. And so we did put on evidence for Mr. Mukamal that in some way or shape was not considered by Judge Williamson. If he did consider it and if he did analyze it and simply didn't find that credible, he didn't say it. And the reason I think that's important is, again, where he did find that Mr. Mukamal did not credibly explain another part of his opinion, he made the effort to say that. So what that says to me as I read this opinion is he didn't consider that evidence because he overlooked it. And if, at a minimum, I believe that what should happen is it should be remanded for Judge Williamson to make findings with respect to that. I think there's enough evidence in the record for this Court to conclude that the debtor was insolvent because Mr. Osher's testimony was at most an ipsy-dixit, and I think it was worse than that. And, again, that's in our brief. He took a high point and a low point and divided by two and said, I'm going to use that for demonstrative purposes. Did no analysis of whether or not the underlying opinions had any validity. No analysis of whether the projections that were utilized were valid. No analysis of whether the high point and the low point were the appropriate high and low point to begin with. And just parroted an opinion that was given by someone else without doing any of his own analysis, not just his own analysis, but making sure that their analysis was fundamentally sound. And the case law says you just can't do that. And it's very clear that under Daubert that is not a proper opinion. That's not a proper way for an expert to testify, and it's not a proper way for an expert to utilize another expert's opinions in deriving their own opinions. You have to test the opinions of the other experts and see if they're valid. On the protective cross appeal, that's briefed. The way I read the case law is if you win, you can't complain about something that the judge didn't rule on at the trial court level, which is what they're doing. If the concern is they think that they would have waived it by not bringing the protective cross appeal, that's not our argument. If this gets remanded for some reason, I don't think they'd waive that argument. Fundamentally, there was no executory contract in existence at this time because there were no remaining obligations under that agreement that would make it, have made it executory. It was assumed under the plan protectively in the case, and there were multiple findings made about how that was not judicial estoppel or collateral estoppel. And the reverse of that would have been if it had been rejected under the bankruptcy code, a rejection of an executory contract or a contract means that it is considered to have been breached as of the date of the petition, the filing of the bankruptcy petition. So had that been done, what the appellee would be here arguing is they can't sue on it because they breached the contract. And so it was done as a protective measure, and that's the only reason that it was done in this case. Thank you all for your time today. Thank you. The court will be in recess until tomorrow at 9. Thank you. All rise.